JOURNAL ENTRY AND OPINION
{¶ 1} The appeal and cross-appeal filed in this case challenge evidentiary decisions and judgments entered by the Cuyahoga County Court of Common Pleas on motions for summary judgment, directed verdict, judgment notwithstanding the verdict, prejudgment interest and attorney fees. For the following reasons, we affirm in part, and reverse and remand in part.
 {¶ 2} The record on appeal reveals the following facts: On April 16, 1999, plaintiff-appellant George McNulty ("McNulty") entered into an agreement with defendant-appellee PLS Acquisition Corp. ("PLS"), a corporation formed under the law of the State of New York. Shortly after its formation, PLS changed its name to ISI Technologies, Inc. ("ISI"). ISI was a wholly-owned subsidiary of R. Brooks Associates, Inc. ("RBA"), a New York corporation based in Williamson, New York.
 {¶ 3} Prior to April 16, 1999, McNulty was the President of PLS International, Inc. ("PLS International"). PLS International was primarily in the business of cleaning and inspecting water and sewer lines, known as closed systems. After experiencing severe financial difficulties, PLS International began negotiations with John Gay ("Gay"), a shareholder and officer of RBA, for the purchase of the business. RBA was and is in the business of inspecting closed systems in nuclear power plants.
 {¶ 4} Discussions between McNulty and RBA began in March 1998, and continued for 13 months until the documents that form the basis of this case were executed on April 6, 1999. During the negotiations, McNulty alleges that RBA promised to hire PLS International's employees, to negotiate PLS's outstanding debts, to employ McNulty for a three-year period, and to buy out the lease on the Ford Explorer that PLS International had been providing for McNulty's use, a $25,000 obligation. McNulty also alleges that he was promised that he would be responsible for all the sales of the new venture in both the United States and Canada, without limitation, and would earn substantial commissions once the company had attained gross sales of at least $2,000,000 in any given year.
 {¶ 5} On April 6, 1999, three separate written agreements were executed; an asset purchase agreement, an employment contract, and a marketing plan.
 {¶ 6} First, a 29-page Asset Purchase Agreement executed by PLS International ("by George McNulty, President"), McNulty, individually, and ISI ("by John Gay, Vice President"). The preamble of the Asset Purchase Agreement identifies PLS as the "Buyer" and is described as "a wholly-owned subsidiary of R. Brooks Associates, Inc." and "a New York Corporation."
 {¶ 7} Pursuant to Section 2.1, the Buyer purchased all of the assets of PLS International, including all tangible personal property, certain intangible assets and property rights, and certain assumed agreements for the sum of $45,000. Section 2.4 provides that the Buyer will not assume any of the liabilities of PLS International. Moreover, Section 2.3(iii) contains the following clause: "Seller shall be solely responsible for the payment of all accounts payable and accrued in the operation of the Business up to and including the date of the Closing [April 16, 1999]."
 {¶ 8} Section 8.3 provides that "this Agreement constitutes the entire agreement of the parties hereto, and supercedes any prior agreements or understandings, whether oral or written, between the parties hereto with respect to the subject matter thereof."
 {¶ 9} Next, a six-page Marketing Agreement executed by PLS International ("by George McNulty, President") and ISI ("by John Gay, Vice President"). McNulty, individually, was not a party to this agreement. RBA was a signatory as well "as a guarantor of actual, accrued royalty payments" pursuant to a specific provision in that agreement.
 {¶ 10} Pursuant to the Marketing Agreement, PLS International and ISI agreed to pay royalties to specified individuals and entities who were creditors of PLS International in return for the release of liens held on the assets sold pursuant to the Asset Purchase Agreement. Section 6 provides that "Buyer agrees to use its best efforts in the promotion and sale of the Equipment and the Services," and defines "best efforts" as the day-to-day sales efforts typically conducted by an organization with financial, sales and technical resources similar to ISI. Section 13 states "this Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors, heirs and permitted assigns."
 {¶ 11} Finally, there was a seven-page Employment Agreement executed by McNulty, individually, and ISI ("by John Gay, Vice President").
 {¶ 12} Pursuant to the Employment Agreement, ISI agreed to employ McNulty as a "Sales and Marketing Consultant" for the term of the contract, April 19, 1999 to April 18, 2002, subject to early termination for "cause." McNulty would receive a base salary of $70,000 per year for the first 18 months and $50,000 for the second 18-month period. McNulty would receive additional bonuses based upon sales exceeding $2,000,000 per annum. Section 17 states "this Agreement constitutes the entire agreement of the parties hereto, and supercedes any prior agreements or understandings, whether oral or written, between the parties hereto with respect to the subject matter thereof."
 {¶ 13} Pursuant to the Asset Purchase Agreement and Employment Agreement, at the closing on April 16, 1999, ISI paid the purchase price of $45,000 for the assets of PLS International, and McNulty became an employee of ISI. On June 1, 1999, McNulty was suspended from ISI with pay. ISI claims that McNulty was suspended because he transferred property that belonged to ISI to a trade creditor of his former business so as to satisfy a debt of approximately $14,000. McNulty subsequently wrote a letter to ISI, inquiring what ISI intended to do about his suspension, which ISI accepted as his resignation as an employee.
 {¶ 14} On September 20, 1999, McNulty commenced this action against ISI, RBA, Gay, Raymond Brooks, and Michael James ("James"), ISI's General Manager (collectively "defendants"). McNulty filed a seven-count complaint sounding in breach of contract, fraud and unjust enrichment against all defendants and sought damages of $700,000.
 {¶ 15} On October 2, 2000, defendants moved for summary judgment on all claims except McNulty's claims for damages against ISI for breach of the Employment Agreement. The trial court denied the motion without opinion and the case proceeded to trial on November 27, 2000.
 {¶ 16} At the close of McNulty's case-in-chief, the court directed a verdict (1) in favor of McNulty and against ISI and Raymond Brooks on McNulty's claim for an accounting, (2) in favor of ISI and Raymond Brooks on McNulty's claims for fraud and intentional infliction of emotional harm, and (3) in favor of Gay and RBA on all claims. The case proceeded against ISI and Raymond Brooks solely on McNulty's claim for breach of the Employment Agreement. Interrogatories and verdict forms were submitted to the jury, which asked whether either ISI or Raymond Brooks breached the Employment Agreement, and whether those defendants were obligated to pay McNulty's legal fees. The jury found that both ISI and Raymond Brooks had breached the Employment Agreement and entered the amount of $250,000 on the general verdict forms against each. Upon a finding that the defendants acted in bad faith, the trial court entered a judgment in favor of McNulty in the amount of $172,262 as an attorney fee award. The judge then ordered prejudgment interest to McNulty upon the jury verdict from the date of the filing of the complaint.
 {¶ 17} McNulty timely appealed and assigns six assignments of error. Defendants cross-appealed and raise nine assignments of error. These issues will be addressed out of order and together where appropriate.
 {¶ 18} "VI. The trial court committed reversible error in ordering the blanket exclusion of relevant evidence and in otherwise impeding the presentation of appellant's case."
 {¶ 19} In this assignment of error, McNulty argues that the trial court improperly applied the parol evidence rule by excluding oral promises and representations made during the course of negotiations. We disagree.
 {¶ 20} The record reflects that McNulty was able, over defense objection, to introduce evidence of the following oral representations: (1) that the outstanding balance on his car lease would be paid by defendants (Tr. 235-236, 293-296); (2) that he would be credited with a $2,000,000 sale (Tr. 245); and (3) that his sales commissions would be based upon all sales made by ISI. With regard to evidence of other oral promises and representations[1], we find that the trial court did not abuse its discretion when it excluded such evidence made during the course of negotiations.
 {¶ 21} Under Ohio's parol evidence rule, prior or contemporaneous conversations which contradict an unambiguous written contract are not admissible in construing that contract absent an allegation of fraud or mistake. Davidson v. Hayes (1990), 69 Ohio App.3d 28; Ohio Savings Bankv. H.L. Vokes Co. (1989), 54 Ohio App.3d 68; Zydel v. Clarkson (1928),29 Ohio App. 382.
 {¶ 22} Here, the record shows that McNulty was engaged in 13 months of negotiations, which culminated in the execution of the Asset Purchase Agreement, the Employment Agreement, and the Marketing Agreement on April 16, 1999. McNulty claims that he was fraudulently induced to enter into these contracts by oral representations made by the defendants. McNulty's argument fails because the only facts used to support this cause of action are the prior oral promises and representations. Merely pointing to prior negotiations absent specific evidence of fraud is not enough to fall outside the scope of the parol evidence rule. Marion Production Credit Association v. Cochran (1988),40 Ohio St.3d 265. The parol evidence rule will not be overcome by merely alleging that a statement or agreement made prior to an unambiguous written contract is different from that which is contained in the contract. Id.
 {¶ 23} McNulty also argues that the oral representations would have been used to explain, not contradict, terms of the contracts and thus are not barred by the parol evidence rule. Specifically, McNulty claims that many of the provisions in the written agreements were vague and required testimony to explain it. We disagree. The record does not support the contention that the written contracts required extrinsic evidence in order to interpret them. To the contrary, the record supports the fact that McNulty reviewed drafts of the agreements and proposed modifications thereto and read and signed the contracts following a 13-month negotiation period. McNulty cannot attempt to rewrite the written contracts through the introduction of prior oral promises and agreements not included in the written contracts as of the date of execution. The trial court acted within its sound discretion in deciding that parol evidence was not required to explain the provisions found within the written contracts.
 {¶ 24} Finally, McNulty asserts that the excluded evidence is relevant to show a breach of good faith and fair dealing and to show defendants' failure to use their best efforts. The record clearly indicates that the oral promises and representations were made prior to the execution of the contracts. McNulty cannot attempt to rewrite an unambiguous written contract with provisions he knew were not included. The implied covenant of good faith and fair dealing cannot be used to make an end run around the parol evidence rule.[2]
 {¶ 25} McNulty's sixth assignment of error is overruled.
 {¶ 26} "I. The trial court committed reversible error in granting appellees' motion for a directed verdict with respect to appellant's tort claim for fraud.
 {¶ 27} "V. The trial court committed reversible error in granting a directed verdict in favor of the appellees as to appellant's claims regarding appellees' breach of the parties' marketing agreement, on the basis that appellant purportedly lacked standing to assert those claims."
 {¶ 28} In these assignments of error, McNulty challenges the directed verdict entered by the trial court in favor of defendants on his claims for fraud and breach of contract.
 {¶ 29} A directed verdict should be granted if the movant is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the non-movant. Sanek v. Duracote Corp.
(1989), 43 Ohio St.3d 169, 172. A jury should consider a plaintiff's claim only if the probative evidence, if believed, would permit reasonable minds to come to different conclusions as to the essential issue of the case. Id. If substantial evidence exists in support of plaintiff's claim, the motion must be overruled. Pariseau v. WedgeProducts, Inc. (1988), 36 Ohio St.3d 124, 127.
 {¶ 30} In deciding whether to grant a motion for a directed verdict, the trial court does not weigh evidence or consider the credibility of the witnesses, but rather, reviews and considers the sufficiency of the evidence as a matter of law. Ruta v. Breckenridge-RemyCo. (1982), 69 Ohio St.2d 66; O'Day v. Webb (1972), 29 Ohio St.2d 215. Because a motion for a directed verdict presents a question of law, an appellate court must conduct a de novo review of the trial court's judgment. Howell v. Dayton Power Light Co. (1995), 102 Ohio App.3d 6,13.
 {¶ 31} With these principles in mind, we proceed to consider whether the trial court's grant of directed verdicts in defendants' favor was appropriate.
Fraud
 {¶ 32} In order to establish a case of fraud, McNulty must prove all of the following: (1) a false representation; (2) knowledge by the person making the representation that it is false; (3) the intent by the person making the representation to induce the other to rely on that representation; (4) rightful reliance by the other to his detriment; and (5) an injury as a result of the reliance. Oak Hill Investment Co. v.Jablonski (1992), 78 Ohio App.3d 643, citing Korodi v. Minot (1987),40 Ohio App.3d 1, 3.
 {¶ 33} Here, McNulty claims that the defendants were operating under a "covert business plan" to his detriment. Specifically, he claims that the defendants made certain oral promises and representations, which were material to his decision to enter into the agreements, which were not fulfilled.[3] We disagree.
 {¶ 34} The record is devoid of any specific facts showing that the defendants knowingly made false representations with the intent to mislead McNulty or concealed any facts concerning the three agreements. Indeed, McNulty entered into the three agreements after more than one year of negotiations. None of the alleged oral representations were included in the written contracts; in fact, a comparison of the alleged oral representations that McNulty claims induced him to enter into the transaction with the three written agreements signed by McNulty demonstrates that the applicable provisions of the written contracts contradict McNulty's claimed oral representations in a meaningful fashion. If, indeed, there was a covert business plan, McNulty has failed to supply this court with any proof of its existence.
 {¶ 35} Since the evidence shows that McNulty cannot establish the elements necessary to support his claim of fraud, the trial court did not err in granting defendants' motion for directed verdict on McNulty's claim for fraud.
Marketing Agreement
 {¶ 36} McNulty's complaint asserted a cause of action against the defendants based upon his allegation that they failed to use their "best efforts" in marketing the technology and services described in the Marketing Agreement executed by the parties on April 16, 1999. Specifically, the Marketing Agreement provided that ISI was to pay a royalty to certain named individuals and entities from income generated by ISI from the sale to the natural gas industry of equipment and services relating to technology it had purchased from McNulty's company.
 {¶ 37} Under the Marketing Agreement, the contracting parties are identified as PLS International, Inc. as the seller, and PLS Acquisition Corp., now ISI Technologies, Inc., as the buyer. McNulty did not sign this agreement in his individual capacity. Further, McNulty is not an office holder of PLS International[4] nor does he constitute a majority of the Board of Directors.[5]
 {¶ 38} Defendants claim that McNulty has failed to establish that he has the authority to bring a claim under the Marketing Agreement since he did not sign it in his individual capacity. This argument is not well-taken in light of the fact that McNulty stood to gain substantial royalty payments over the following five to ten years. Nevertheless, we find that McNulty has failed to demonstrate a breach of the agreement.
 {¶ 39} A party bringing a cause of action for breach of contract must demonstrate the following: (1) the existence of a binding contract or agreement; (2) that the non-breaching party performed its contractual obligations; (3) that the other party failed to fulfill its contractual obligations without legal excuse; and (4) that the non-breaching party suffered damages as a result of the breach. Garofalo v. Chicago TitleInsurance Co. (1995), 104 Ohio App.3d 95; McIntyre v. Thriftco, Inc. (May 17, 2001), Cuyahoga App. No. 77767.
 {¶ 40} Here, McNulty alleged that defendants were operating under a "covert business plan" and that they sabotaged the entire transaction by failing to actively pursue the gas market, which was to be the source of his royalty payments, and failed to use their "best efforts." By limiting the amount of proof to defendants' conduct, McNulty failed to substantiate the allegations. McNulty points to the fact that the defendants failed to include him on sales calls and customer inquiries, claiming that this is evidence of their "true colors" and secret business plan. These arguments fall short of creating a jury issue as to the breach of the Marketing Agreement. The complainant in a breach of contract action must point to specific, substantial evidence as to the elements of the breach. Merely coloring the events as "covert" does not substantiate the breach of contract claim. Accordingly, the trial court did not err in granting defendants' motion for directed verdict on McNulty's claim for breach of the Marketing Agreement.
 {¶ 41} McNulty's first and fifth assignments of error are overruled.
 {¶ 42} "II. The trial court committed reversible error in granting appellees' motion for a directed verdict as to appellant's claims against defendant-appellees John Gay and R. Brooks Associates, Inc.
 {¶ 43} "CROSS-ASSIGNMENT OF ERROR I. The trial court erred in denying Raymond Brooks' motion for directed verdict as to his liability on the Employment Agreement because he was neither a party nor a signatory."
 {¶ 44} Inasmuch as these assignments of error deal with the same law, they will be addressed together. McNulty argues that the trial court erred in granting directed verdicts as to the claims against defendants John Gay and R. Brooks Associates, Inc ("RBA"). In turn, defendants argue that the trial court erred in denying Raymond Brooks' motion for directed verdict as to his liability on the Employment Contract.
 {¶ 45} McNulty claims that all defendants can be held liable as joint venturers. This argument fails since ISI is a duly formed corporation. A corporate entity cannot be a joint venture since they are mutually exclusive. Itel Containers Int'l Corp. v. Atlanttrafik Exp.Serv. Ltd., 909 F.2d 698, 703 (2d Cir. 1990). The Employment Agreement makes no mention of a joint venture and the record does not support that the parties intended for the transactions to be a joint venture. Accordingly, in order to decide whether the trial court properly granted dismissal in favor of John Gay and RBA, and properly denied dismissal in favor of Raymond Brooks, we must analyze the requirements for disregarding the corporate form under New York law, and then determine whether the trial correctly applied those requirements to the facts of this case.
 {¶ 46} Under New York law, when a corporation is used by an individual to accomplish his own and not the corporation's business, such a controlling shareholder may be held liable for the corporation's commercial dealings as well as for its negligent acts. Walkovszky v.Carlton (1966), 18 N.Y.2d 414, 417. Where there is proof that defendants were doing business in their individual capacities to suit their own ends, the imposition of liability on individual stockholders is warranted. Id. at 420. The critical question is whether the corporation is a "shell" being used by the individual shareowners to advance their own "purely personal rather than corporate ends." Port Chester Elec.Constr. Corp. v. Atlas (1976), 40 N.Y.2d 652, 656-657.
 {¶ 47} Liability may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties. Itel Containers Int'l Corp. v. AtlanttrafikExp. Serv. Ltd., supra at 703. New York law allows the corporate veil to be pierced either when there is fraud or when the corporation has been used as an alter ego. Id.
 {¶ 48} The following three-part test is used to determine when to pierce a corporation's veil: The corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when: (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own; (2) control over the corporation by those to be held liable was exercised in such a manner to commit fraud or an illegal act against the person seeking to disregard the corporate entity; and (3) injury or unjust loss resulted to the plaintiffs from such control and wrong. Morris v.New York State Dept. of Taxation and Finance (1993), 603 N.Y.S.2d 807,810; A.W. Fiur Co. v. Ataca Co. (1979), 422 N.Y.S.2d 419.[6]
 {¶ 49} Here, it is significant that the jury found a breach of the Employment Agreement. We believe that the trial court erred in taking away from the jury's consideration the liability of John Gay and RBA as to breach of the Employment Agreement. We also believe the trial court did not err in allowing the jury to find Raymond Brooks liable even though he was not a signatory to the Employment Agreement. This is so because the record provides ample evidence to create a jury issue as to whether ISI was a separate corporate entity, so as to shield RBA and its managing agents from liability. Defendants argue that McNulty failed to offer enough evidence at trial to support an alter ego claim. We disagree.
 {¶ 50} At trial, the following evidence was submitted: All of the pre-contract negotations were conducted by John Gay and other agents of RBA, with a number of the negotiating sessions taking place at RBA's corporate headquarters in New York state. The pre-contract negotiating letters were written on behalf of RBA and on either RBA letterhead or that of their corporate counsel. Correspondence written by McNulty was addressed to RBA headquarters to RBA agents. RBA supplied ISI with credit, financial assistance and employees. Further, McNulty points to the failure of defendants to produce loan agreements, repayment schedules or corporate resolutions to support the contention that ISI was operating as a truly independent corporate entity.
 {¶ 51} Looking at these factors and considering the totality of the evidence, and drawing, as we must, all inferences favorably to McNulty, we think a jury could find a level of control that was substantial, and could be interpreted as sufficient domination to justify piercing the corporate veil to reach the assets of RBA or its managing partners John Gay and Raymond Brooks.
 {¶ 52} The trial record supports McNulty's argument that there exists a question of fact as to whether ISI was created as a shell corporation to shield RBA and its managing agents from liability. There is also enough evidence for a jury to consider whether RBA and its managing agents named in this case, Raymond Brooks and John Gay, can be held liable for breach of the Employment Contract. Accordingly, McNulty's second assignment of error is sustained and defendants' first cross-assignment of error is overruled and the case is remanded on the issue of whether John Gay and RBA can be held liable as to the breach of the Employment Contract.
 {¶ 53} "III. The trial court committed reversible error in denying appellant's motion for judgment notwithstanding the verdict regarding appellees' joint and several liability."
 {¶ 54} In this assignment of error, McNulty argues that the trial court erred in denying his motion for judgment notwithstanding the verdict and allowing the jury's award of $250,000 against each defendant to stand. Specifically, McNulty argues that ISI and Raymond Brooks should be held jointly and severally liable in the amount of $500,000. We disagree.
 {¶ 55} McNulty never sought joint and several liability in his complaint. Moreover, he failed to request a jury instruction on joint and several liability during trial. The failure to request a jury instruction generally results in the waiver of the issue on appeal. Goldfuss v.Davidson (1997), 79 Ohio St.3d 116, 121.[7]
 {¶ 56} McNulty's third assignment of error is overruled.
 {¶ 57} "IV. The trial court committed reversible error in failing to commence the running of pre-judgment interest as of April 16, 1999 or, in the alternative either May 3, 1999 or June 1, 1999.
 {¶ 58} "CROSS ASSIGNMENT OF ERROR IV. The trial court erred in granting pre-judgment interest because plaintiff failed to carry his necessary evidentiary burden."
 {¶ 59} In these assignments of error, the parties challenge the trial court's grant of pre-judgment interest. McNulty claims that the trial court erred in its calculation of the starting date whereas defendants claim that the plaintiff is not entitled to pre-judgment interest. For the following reasons, we agree with McNulty.
 {¶ 60} On January 10, 2001, the trial court conducted a hearing on McNulty's motion for pre-judgment interest. At the hearing, McNulty suggested three separate dates to the court as to when the breach occurred: April 16, 1999[8], May 3, 1999[9] or June 1, 1999[10]. On January 24, 2001, the trial court granted pre-judgment interest on the entire amount of the judgment from the date of the filing of the complaint, namely, September 20, 1999.
 {¶ 61} R.C. 1343.03(A), which provides for pre-judgment interest in breach of contract actions, states:
 {¶ 62} "In cases other than those provided for in sections 1343.01
and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, and no more, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract."
 {¶ 63} In cases like this, where a party has been granted judgment on an underlying contract claim, that party is entitled to pre-judgment interest as a matter of law. Royal Elec. Constr. Corp. v. Ohio StateUniv. (1995), 73 Ohio St.3d 110, 117; Reminger Reminger Co.,L.P.A. v. Fred Siegel Co. (Mar. 1, 2001), Cuyahoga App. No. 77712.[11]
The purpose of the interest award is to make the aggrieved party whole by compensating for the period of time between the claim becoming "due and payable" and the judgment. Id.
 {¶ 64} Pre-judgment interest is calculated from the accrual date of the breach of contract claim. Id.; Lavelle v. Lee A. Gettling, Inc.
(March 15, 2001), Cuyahoga App. No. 77684.[12] It is not calculated from the date the action is filed by the plaintiff. Id.[13] The trial court must make the factual determination as to when the breach occurred. Braverman v. Spriggs (1980), 68 Ohio App.2d 58, 60; Suttle v.DeCesare (July 5, 2001), Cuyahoga App. No. 77753; Reminger RemingerCo., L.P.A. v. Fred Siegel Co., supra; Akron v. Kalavity (Dec. 30, 1998), Summit App. No. 19010. This factual decision will be reviewed on appeal under an abuse of discretion standard. Cincinnati Ins. Co. v.First Natl. Bank of Akron (1980), 63 Ohio St.2d 220.
 {¶ 65} Here, the trial court, in an entry dated January 24, 2001, awarded pre-judgment interest from the date of the filing of the original complaint, September 20, 1999. This it cannot do. See Ibid. The ten percent interest should have run from the accrual of the breach of the contract claim. Clearly, the accrual of the breach of contract claim occurred prior to this filing of this complaint, at its earliest, April 16, 1999 (the date the three agreements were executed by the parties), and at its latest August 3, 1999 (the date that McNulty's employment was officially terminated). Accordingly, the matter of pre-judgment interest is reversed and remanded for the trial court to determine when the actual breach occurred.
CROSS-APPEAL
 {¶ 66} "CROSS-ASSIGNMENT OF ERROR II. The trial court erred in presenting the issue of attorney fees to the jury.
 {¶ 67} "CROSS-ASSIGNMENT OF ERROR III. The trial court erred in awarding attorney fees in the amount of $172,262 without an evidentiary hearing."
 {¶ 68} In these cross-assignments of error, defendants claim that the issue of attorney fees should not have been presented to the jury and that the trial court erred in assessing attorney fees without an evidentiary hearing. For the following reasons, we agree, in part.
 {¶ 69} Under New York law, there is no absolute right to attorney fees in an action for breach of contract since, under the "American Rule," the prevailing litigant is not entitled to collect attorney fees from the losing party. American Motorists Ins. Co. v. Trans Int'l Corp.
(1999), 696 N.Y.S.2d 186. However, a party can collect attorney fees when a statute or enforceable contract provides for such fees or the losing party acts in bad faith, vexatiously, wantonly, or for oppressive reasons. Raff v. Maggio, 743 F. Supp. 147, 149 (E.D.N.Y. 1990); Oliveriv. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986); Chambers v. Nasco,501 U.S. 32 (1991).
 {¶ 70} Here, the award of attorney fees was not authorized by statute, court rule, or the agreements themselves. Thus, the only exception which could apply is the exception dealing with bad faith litigation. Prior to jury deliberations, the trial court gave the following instruction to the jury with regard to attorney fees: "The nonbreaching party in a breach of contract case can recover damages if the conduct of the breaching party demonstrates bad faith and is such that the natural and probable consequences of the breach results in these damages. In cases where it is reasonable to conclude that litigation will be necessary in order to effect a collection of monies due under a broken contract, attorney fees may be a natural and probable consequence of the breach and, therefore, recoverable as an element of compensatory damages.
 {¶ 71} "Accordingly, if you find that plaintiff is entitled to recover compensatory damages for breach of contract, you may consider also his entitlement to attorney fees as well.
 {¶ 72} "Bad faith means the opposite of good faith, generally implying or involving actual or constructive fraud or a design to mislead or deceive another or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.
 {¶ 73} "The term bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. It is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design of ill will."
 {¶ 74} We find this instruction to be an accurate statement of New York law. The trial court correctly ruled that the issue of McNulty's entitlement to attorney fees was one for the jury's determination if the jury found that the evidence demonstrated that the defendants breached the contract in bad faith. Accordingly, we find no error in the trial court's submission of the issue of attorney fees to the jury and overrule defendants' second cross-assignment of error.
 {¶ 75} With regard to defendants' third cross-assignment of error, however, we agree with the defendants and find that the trial court erred in its determination that McNulty was entitled to $172,262 in attorney fees. Under New York law, the party seeking an award of attorney fees should submit evidence supporting the hours worked and the rates claimed. F.H. Krear Co. v. Nineteen Named Trustees (2d Cir. N.Y. 1987), 810 F.2d 1250, 1266. The determination of a reasonable fee is based upon the number of hours reasonably expended on the litigation multiplied by a reasonable rate. However, the outcome of the litigation is a crucial factor in the fee determination. MTX Communications Corp.v. LDDS/Worldcom, Inc. (S.D.N.Y. 2001), 2001 U.S. Dist. LEXIS 7912, 95 Civ. 9569, citing from Hensley v. Eckerhart (1983), 461 U.S. 424. Attorney fees should not be awarded for services on unsuccessful claims that are distinct from successful claims. Id.
 {¶ 76} Here, McNulty filed a request for attorney fees for the period from July 1999 through the end of litigation. His attorney claimed 918.5 hours worked and sought payment at rates varying from $60 to $250 per hour for a total amount of $172,262. The trial court awarded the entire amount submitted by McNulty. However, this total reflected all of the work done by McNulty's attorney, including work done on the six causes of actions that were removed from consideration by the jury by directed verdict. Since fees should not be awarded for services that were done on unsuccessful claims, the award of attorney fees is vacated and remanded for a determination of which fees are reasonable in light of McNulty's partial success.
 {¶ 77} Defendants' third cross-assignment of error is sustained.
 {¶ 78} "CROSS-ASSIGNMENT OF ERROR V. The trial court erred in directing a verdict in favor of plaintiff on plaintiff's claim for an accounting."
 {¶ 79} In their fifth cross-assignment of error, defendants argue that McNulty has no right to an accounting for breach of the Employment Agreement. McNulty responds that he is entitled to an accounting given the need to calculate damages under the three agreements. We disagree since the only agreement at issue is the Employment Agreement.
 {¶ 80} Ohio law has consistently held that where there is an adequate remedy at law, an equitable remedy is improper. AssociatedEstates Corp. v. Bartell (1986), 24 Ohio App.3d 6. An accounting is an equitable remedy. Knight v. Burns (1926), 22 Ohio App. 482.
 {¶ 81} Here, as to the breach of the Employment Contract, McNulty was rendered a jury verdict in the amount of $250,000 against defendants Raymond Brooks and ISI. Given there are no other facts to show this is not an adequate or complete remedy at law, it would be inappropriate to find an accounting to be a proper remedy. McNulty argues that he is entitled to an accounting as a joint venturer. However, that argument is not well taken in light of the fact that the parties did not enter into the Employment Contract as joint venturers. McNulty further argues that the Marketing Agreement contains a provision that entitles him to an accounting. However, it would be outside this court's jurisdiction to enforce such a provision.
 {¶ 82} Defendants' fifth cross-assignment of error is sustained.
 {¶ 83} "CROSS-ASSIGNMENT OF ERROR VI. The trial court committed prejudicial error in allowing plaintiff's expert economist to offer opinion testimony as to damages beyond the three year term of employment contract and opinion testimony as to any damages in the form of lost `bonus' or sales commission income.
 {¶ 84} "CROSS-ASSIGNMENT OF ERROR VII. The trial court erred in permitting the introduction of the following evidence: (1) parol evidence; (2) evidence of defendant Raymond Brooks' income; and (3) evidence of the `collectability of defendant PLS Acquisition Corp., now ISI Technologies.'"
 {¶ 85} In these two cross-assignments of error, defendants argue that the trial court made erroneous evidentiary decisions during the trial. Specifically, defendants claim that the following evidence should not have been admitted: (1) expert testimony on sales commissions beyond the three-year term under the Employment Agreement; (2) evidence, as argued in McNulty's sixth assignment of error, of oral promises made prior to the execution of the written contracts; (3) evidence of Raymond Brooks' income; and (4) evidence showing the collectability of ISI and Raymond Brooks.
 {¶ 86} The admission of relevant evidence pursuant to Evid.R. 401 rests within the sound discretion of the trial court. Rigby v. LakeCity (1991), 58 Ohio St.3d 269. An appellate court's review of the admission of evidence is limited to the issue of whether the trial court abused its discretion. State v. Finnerty (1989), 45 Ohio St.3d 104,107. An abuse of discretion occurs when the trial court acted unreasonably, arbitrarily, or unconscionably. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 87} Defendants first argue that McNulty's expert witness, Dr. John Burke, should not have been allowed to testify about McNulty's lost sales commission. We agree,[14] but find such error waived. Specifically, the record shows that the trial court offered to give limiting instructions as to Dr. Burke's testimony (Tr. 788, 790-791), and that defense counsel, following the trial court's grant of directed verdict in their favor, declined the offer. (Tr. 847). The failure to request a curative instruction at the time error can be avoided or corrected precludes any claim of error on appeal where it appears that a curative instruction would have obviated the potential prejudice. Statev. Lancaster (1971), 25 Ohio St.2d 83; Whitenight v. Dominique (1995),102 Ohio App.3d 769, 771; Evid.R. 105; State v. Collins (1990),66 Ohio App.3d 438, 445; Gler v. Schine Theatrical Co. (1938),59 Ohio App. 68.
 {¶ 88} Next, defendants argue that the trial court unevenly applied the parol evidence rule when it allowed evidence of oral representations and promises made prior to the execution of the three written contracts. Defendants argue that this evidence is irrelevant to any claims raised by McNulty in his complaint. We disagree.
 {¶ 89} In his complaint, McNulty alleged fraud and breach of contract. Parol evidence is admissible when used to show fraud. Davidsonv. Hayes, supra; Ohio Savings Bank v. H.L. Vokes Co., supra; Zydel v.Clarkson, supra. The trial court allowed some evidence of prior oral promises and disallowed others. (See McNulty's sixth assignment of error). We can find no abuse of discretion in this decision. In addition, any resultant prejudice to the defendants was lessened when the trial court instructed the jury as to the proper use of such evidence.
 {¶ 90} Finally, as to the relevance of Raymond Brooks' income and ISI's collectability, we cannot say that the trial court abused its broad discretion in allowing such evidence.
 {¶ 91} Defendants' sixth and seventh cross-assignments of error are overruled.
 {¶ 92} "CROSS-ASSIGNMENT OF ERROR VIII. The trial court erred in denying defendants' motion for summary judgment."
 {¶ 93} In this cross-assignment of error, defendants argue that the trial court erroneously denied their motion for summary judgment. We disagree.
 {¶ 94} Summary judgment is appropriate where it appears that (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. Harless v. WillisDay Warehousing Co., Inc. (1978), 54 Ohio St.2d 64, 66; Civ.R. 56(C).
 {¶ 95} Here, the record shows that the parties presented sharply conflicting theories and evidence in their cross-motions for summary judgment to support their versions of the relevant events. Thus, we find that these matters involved disputed issues of fact which were properly submitted to a jury. Indeed, the matter proceeded to a lengthy trial over the course of five days with more than 1,200 pages of trial testimony. Under the circumstances, defendants have not shown that the trial court committed any error by denying their motion for summary judgment on McNulty's claims. Even if summary judgment should have been granted, defendants failed to show any prejudice. Where a litigant still gets his day in court, the Ohio Supreme Court has held that the principle of harmless error applies to the improper denial of a motion for summary judgment. Continental Ins. Co. v. Whittington (1994), 71 Ohio St.3d 150,156-158. Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless when evidence at the subsequent trial demonstrates there were genuine issues of fact. Id.
 {¶ 96} Defendants' eighth cross-assignment of error is overruled.
 {¶ 97} "CROSS-ASSIGNMENT OF ERROR IX. The trial court erred in denying defendants' motion for a new trial."
 {¶ 98} In this cross-assignment of error, defendants argue that the trial court should have ordered a new trial based on the misconduct of McNulty's counsel. Specifically, defendants argue that McNulty's counsel posed improper questions during the trial in disregard of the trial court's evidentiary rulings and made improper and inflammatory statements during his closing argument.
 {¶ 99} The granting of a motion for new trial rests largely in the sound discretion of the trial court. A reviewing court will not disturb the trial court's ruling unless there is an abuse of discretion. Verbonv. Pennese (1982), 7 Ohio App.3d 182. Upon careful review of the record, we cannot say that defendants were so prejudiced by the conduct of McNulty's counsel as to warrant a new trial. Any resultant prejudice from improper questions was offset by the trial court's instruction to the jury. Defense counsel has failed to show that the jury returned a verdict that was against the manifest weight of the evidence.
 {¶ 100} Defendants' ninth cross-assignment of error is overruled.
 {¶ 101} Judgment affirmed in part and reversed and remanded in part for proceedings consistent with this opinion.
It is ordered that appellees/cross-appellants and appellant/cross-appellee share equally the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA A. BLACKMON, P.J., and COLLEEN CONWAY COONEY, J., CONCUR.
[1] McNulty claims that the following parol evidence should also have been admitted at trial: a promise by John Gay that PLS's indebtedness to Gas Research Institute would be satisfied; a promise that PLS's truck lease would be bought out; a promise to take care of McNulty's patent lawyers' bill; a representation that McNulty would quickly reach the $2 million sales mark; and promises that the jobs of all McNulty's former employees would be secured in the new operation.
[2] Since we do not find that the trial court abused its discretion in excluding the evidence on parol evidence grounds, we decline to address the application of the statute of frauds.
[3] For instance, in paragraph 25 of the complaint, McNulty asserts that "defendants failed to live up to their representations, promises, and commitments in a variety of respects, including but not limited to: mismanaging the business formerly known as PLS International, Inc., failing and/or refusing to use their best efforts to develop and market the inspection technology and services as required, and/or refusing to discharge the plaintiff's business obligations and debts as contemplated by the parties' agreements and by the defendant's representatives."
[4] On April 30, 1999, McNulty resigned as President of PLS International, Inc.
[5] McNulty is one of three directors of the Board of Directors of PLS International, Inc.
[6] Ohio law mirrors these requirements for disregarding the corporate form and holding individual shareholders liable for corporate wrongs. SeeBelvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos. (1993),67 Ohio St.3d 274.
[7] An appellate court may recognize waived error if it rises to the level of plain error. Goldfuss, at syllabus. Here, there is no obvious error since McNulty offers no evidence, nor does the record support his contention, that ISI and Raymond Brooks should be jointly and severally liable. The jury found that both ISI and Raymond Brooks had breached the employment contract with McNulty and that McNulty suffered damages in the amount of $250,000 per defendant as a result of such breach. The fact that ISI has filed for bankruptcy relief during the pendency of this appeal is not sufficient grounds upon which to impose joint and several liability. Issues that arise concerning the collection of a judgment are beyond the scope of this court's jurisdiction.
[8] The date of the execution of the three contracts.
[9] The date that defendants instructed McNulty that he was to restrict his sales activities to a geographical area within 200 miles of the City of Cleveland.
[10] The date that defendants issued a letter notifying McNulty of his suspension and forbidding him from making any further sales calls.
[11] Although both parties cite to Ohio law with regard to the issue of pre-judgment interest, we note that New York law is virtually identical as it relates to pre-judgment interest. Specifically, under New York law, an award of pre-judgment interest is recoverable as a matter of right where a breach of contract has been established. See N.Y.C.P.L.R. § 5001;Adams v. Lindblad Travel, Inc., 730 F.2d 89, 93 (2nd Cir. 1984).
[12] Under New York law, pre-judgment interest shall be computed from "the earliest ascertainable date the cause of action existed." N.Y.C.P.L.R. § 5001, supra. See, also, Wasilewski v. Dalton Sch.,Inc., 580 N.Y.S.2d 265, 266 (interest should be awarded from the date the cause of action accrued).
[13] Although Justice Moyer's dissent in Royal Elec. Constr. Corp. v.Ohio State Univ. (1995), 73 Ohio St.3d 110 stands for the proposition that the accrual date begins "when an action is filed by the plaintiff," the majority of the Supreme Court of Ohio clearly found that an award of pre-judgment interest should be calculated "for the period of time between accrual of the claim and judgment." Id. at 117.
[14] ¶ a In an action for breach of contract, a plaintiff is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty. KenfordCo. v. County of Erie (1986), 67 N.Y.2d 257, 261. The damages may not be "merely speculative, possible or imaginary." Id. Although lost profits need not be proven with "mathematical precision," they must be "capable of measurement based upon known reliable factors without undue speculation." Ashland Mgt. Inc. v. Janien (1993), 82 N.Y.2d 395. Evidence of lost profits from a new business venture receive greater scrutiny because there is no track record upon which to base an estimate. Kenford, supra at 261.
¶ b Here, ISI was a new business. At trial, Dr. Burke based his figures on his assumption that "sales would be constant throughout the year." (Tr. 733-734). Dr. Burke's testimony on McNulty's lost sales commissions, although based upon the terms of the Employment Agreement, were largely hypothetical since there was no historic record of operations from which lost profits could be projected. Thus, Dr. Burke should not have been allowed to testify about lost commissions beyond what McNulty would have been entitled to under the express terms of the Employment Agreement.